## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
Case No. 14-cv-23219-SEITZ

**ORLANDO ARTOLA,**
             Plaintiff,

v.

**MRC EXPRESS, INC., AND**
**ALPHA LOGISTICS SERVICES, INC.,**
             Defendants.
_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on cross motions for summary judgment. [DE-35; 38.] The primary legal dispute is whether the Plaintiff was an employee or an independent contractor under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219. Both motions must in large part be denied because the parties present materially conflicting descriptions of the same working relationship.

The Plaintiff, Orlando Artola, asserts he was an employee delivery driver with the Defendants, Alpha Logistics Services, Inc., and MRC Express, Inc. (hereinafter MRC), for over three years, regularly working sixty hours a week without overtime compensation. He seeks liquidated damages as well as $36,379 in unpaid overtime. The Defendants, on the other hand, maintain that Artola was as an independent contractor, and thus not entitled to FLSA protections.  The Defendants also assert that Artola has no claim to overtime once he was paid through his corporation, and that Artola never worked for Alpha Logistics Services, Inc.

1

The Court has reviewed the motions, responses, replies, and the record. Because Artola has stipulated that he was never employed by Alpha Logistics Services, Inc., [DE-42, ¶ 5], the Defendants' motion is hereby granted as to Defendant Alpha Logistics Services, Inc.[1] However, because genuine issues of material fact remain in dispute, the Defendant MRC's motion for summary judgment is denied. The Plaintiff's motion for partial summary judgment is denied for the same reason.

## I.    LEGAL FRAMEWORK

In filing cross motions for summary judgment, both parties represent that there are no genuine issues of material fact, and that the undisputed facts are sufficient to determine liability as a matter of law.[2] However, the record and the parties' own motions belie this representation. Employment status under the FLSA is a matter of law; however, subsidiary findings are considered issues of fact.[3] Here, both genuine material disputes and insufficient undisputed facts prevent the Court from making the subsidiary factual findings necessary to determine whether Artola was an employee or an independent contractor as a matter of law. Thus, summary judgment is inappropriate.

The FLSA expressly rejects common-law and agency approaches to employment,

---

[1] Because summary judgment is granted for Defendant Alpha Logistics Services, Inc., use of "Defendant" hereinafter refers to MRC alone, and the terms "MRC" and "Defendant" will be used interchangeably for the remainder of this Order.
[2] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).
[3] Patel v. Wargo, 803 F.2d 632, 634 (11th Cir. 1986).

and adopts a much broader "suffer or permit" to work standard.[4] The Eleventh Circuit, among others, applies a non-exclusive, six-factor analysis to help apply this expansive standard and distinguish between employees and workers who are not covered by the FLSA, such as independent contractors.[5] The factors are not to be weighed in any mechanical sense or to strictly dictate an outcome, as the ultimate inquiry is one of economic reality: is the worker economically dependent upon the business to which he renders services, or is he, instead, essentially in business for himself?[6] The six factors are:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in materials or equipment required for his task;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working relationship;
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.[7]

This economic reality inquiry discourages a formal approach. Contract language

---

[4] *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1310-11 (5th Cir. 1976). In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[5] *See Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311-12 (11th Cir. 2013).

[6] *Id.*

[7] *Id.* Note these factors are specific to FLSA employee-independent contractor analysis. To distinguish between employees and independent contractors under Florida state law, there is a parallel, but distinct, analysis. *See Carlson v. FedEx Ground Package Sys., Inc.*, 787 F.3d 1313, 1318-19 (11th Cir. 2015) (noting ten factors applied by Florida Supreme Court in employee v. independent contractor analysis). There are also additional factors utilized to assess joint employment under the FLSA, which are not relevant here.

is not given undue weight, as the parties' intentions are irrelevant,[8] employees cannot waive FLSA protections,[9] and the FLSA purposefully eschews common-law employment concepts.[10] Similarly, neither a worker's tax filing status,[11] nor any other label affixed by either party to the working relationship, is determinative in distinguishing an employee from a contractor under the FLSA.[12] Furthermore, employers cannot avoid liability based on the needs of their chosen industry or customers.[13] If the industry or customers demand working conditions which prevent the economic freedom required for independent contractors, an employer can choose different customers, switch industries, or hire employees.[14]

II.   **FACTUAL BACKGROUND**

   A.  **UNDISPUTED FACTS**

      i.   **The Parties**

MRC is a logistics company based in Orlando, Florida. MRC provides delivery

---

[8] *Usery*, 527 F.2d at 1315 ("Neither contractual recitations nor subjective intent can mandate the outcome in [FLSA] cases.") (internal citations omitted).

[9] *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) ("FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate.") (internal citations omitted).

[10] *E.g. Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996); *Aimable v. Long & Scott Farms*, 20 F.3d 434, 439 (11th Cir. 1994).

[11] *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) (finding workers characterized as self-employed on tax returns FLSA employees); *Quezada v. Sante Shipping Lines, Inc.*, 2013 WL 1334516, at *12 (S.D. Fla. 2013) (finding worker who was paid via 1099 rather than W2 *at workers request* to be employee for FLSA purposes) (emphasis added).

[12] *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("[A]n employer's self-serving label of workers as independent contractors is not controlling."); *Yilmaz v. Mann*, 2014 WL 1018006, at *4 (S.D. Fla. 2014) ("The parties' subjective beliefs and expectations, as well as the labels they place on their relationship, are immaterial.").

[13] *See Scantland*, 721 F.3d at 1316.

[14] *Id.*

and warehousing services, and the company grossed between 7.5 and 8.5 million dollars yearly from 2011 to 2014. MRC's delivery business is responsible for at least 50% of its total revenue. During the relevant time period, MRC employed, or contracted with, approximately fifteen to twenty delivery drivers in south Florida. Seven to eight of those drivers serviced MRC's customer, H.D. Smith LLC (hereinafter H.D. Smith), a wholesale drug distributor with a warehouse in Pompano Beach, Florida. All drivers that MRC assigned to H.D. Smith entered into a Contractor Purchased Transportation Agreement with MRC. The Plaintiff, Orlando Artola, was one such driver.

Artola worked as a delivery driver for MRC from at least April 2011 through August 28, 2014.[15] He worked exclusively out of H.D. Smith's Pompano Beach warehouse, Monday through Friday, completing both the morning (AM) and the afternoon (PM) shifts, or "routes." His work day began around 6 a.m., when H.D. Smith's warehouse opened. Once he arrived, he would unload his personally-owned vehicle[16] of any empty containers and return them along with the list of deliveries completed from his PM route the day before. He would receive a list of the deliveries to be completed that morning within his geographic area.[17] Each delivery had its own

---

[15] Artola testified that he began to work for MRC in April 2010. MRC contends Artola was hired in April 2011. Because the relevant statute of limitations extends no more than three years from the date of filing suit, this dispute is immaterial for the purposes of this motion. It is interesting, however, that the parties cannot agree on this seemingly obvious point of fact.

[16] Artola owns a 2005 Dodge Sprinter van used principally for his delivery work.

[17] There is a dispute about the extent to which drivers could increase or decrease the stops they were given, but the record appears uncontested as to, roughly, how the stops were originally allocated. The list of stops, or deliveries, for a given shift did not *originate* with the driver. H.D. Smith gave MRC the list of customers expecting deliveries and their customers' delivery time windows. (Howard dep. 12:23-13:11.)

"manifest," which included what product was to be delivered, how much product was to be delivered, the delivery address, and a space to input the delivery time. Artola would take the product he was to deliver from the warehouse to his work vehicle. MRC never provided Artola with any equipment to move or transport products; H.D. Smith provided some equipment at the warehouse.

Once Artola loaded his vehicle, he began his AM deliveries. Artola determined the order of the stops, as well as the route between stops. H.D. Smith's customers signed the manifests to confirm receipt of their product; the delivery time was also supposed to be recorded, thought this did not always occur. Between deliveries, Artola could take breaks or eat lunch whenever he wanted to, schedule permitting.[18] Because Artola chose to work the PM shift in addition to the AM shift, he would return to H.D. Smith's warehouse after he completed his AM deliveries, and the same cycle would be repeated in the afternoon. Upon completing his last PM delivery, Artola went home (not back to the warehouse). Artola only delivered to H.D. Smith's customers, never to any of his own customers, while he worked for MRC.

No one at MRC kept track of drivers' total work hours. Artola and the other

---

MRC's logistics system would then compile a list of customers requiring deliveries during a given shift within a given geographical area. (*Id.* 12:23-13:11; Brioso dep. 17:17-24.) At the beginning of each shift, that list was provided to the driver covering that geographical area. (Brioso dep. 11:10-12:5; Artola dep. 126: 1-9; Sample Manifests.) The record fails to elucidate how the drivers' geographical assignment was determined or negotiated.

[18] Artola testified that his break or lunch times were not specified by MRC, but that he always ate lunch while driving and had at most twenty minutes of break time daily. (Artola dep. 50:11-51:4).

drivers were paid by the stop.[19] Rates per stop varied by driver, location, and delivery time. The number of stops for each driver varied daily. As a result of that daily variation, drivers' weekly, monthly, and yearly pay varied as well.

Artola and the other drivers were not monitored by GPS or otherwise while they completed routes. Drivers did need to notify MRC (via Luis Bueno, see below) if they were running late, had issues completing deliveries during the route, or needed to take time off. Drivers could also get other MRC drivers or "helpers" to complete deliveries for them. Artola's wife, Rebeca Artola, regularly completed deliveries for her husband as a "helper." Artola and other drivers were paid for stops completed by others; it was the driver's responsibility to pay anyone who covered a delivery on their behalf. Drivers were allowed to work for other companies, and some did. Artola did not.[20]

No one designated by MRC as an employee or supervisor worked at H.D. Smith's warehouse.  Instead, a purported independent contractor named Luis Bueno was designated as the "lead driver" for MRC drivers at H.D. Smith. Bueno was in charge of collecting drivers' daily manifests, distributing drivers' checks, and informing MRC's logistics manager, Richard Brioso, of any issues with drivers or deliveries. Drivers also contacted Bueno if they wanted to take time off; Bueno would forward this information to Brioso. Brioso is an MRC employee who works at MRC's Fort Lauderdale facilities.

---

[19] Hence, overtime was not calculated or compensated.
[20] Artola testified that his MRC schedule did not leave him any time to work for other companies. (Pl. dep. 129:17-24.)

MRC neither provided nor required any formal training. The job requirements appear to have been straightforward. Drivers had to have a valid driver's license, a cellphone, a suitable vehicle, the physical capacity to carry or transport products, and the ability to navigate between stops. Drivers were responsible for all expenses, including maintaining vehicle and cargo insurance at a particular level of coverage, purchasing the company t-shirts and ID badges—which drivers had to wear at all times—and paying for their own and their helpers' drug tests.

MRC provided no employee benefits to its drivers. The only deductions from drivers' paychecks were for cargo insurance, if the driver did not purchase his own. From at least April 2011 through February 2014, MRC paid Artola directly for his delivery services. In February 2014, the Artolas created U-Trust Delivery Corp. From March through August 2014, MRC paid U-Trust for Artola's delivery services.

MRC provided Artola with a 1099 form for tax purposes. Artola, in turn, filed joint tax returns with his wife, designating each spouse as self-employed. (Ms. Artola is also in the delivery or courier business.) From 2011 through 2014, the Artolas declared significant business expenses for items such as car repair and maintenance, tolls, gas, cell phone bills, and uniforms.

### ii.    The Parties Written Agreement

There is a document in the record entitled "Contractor Purchased Transportation Agreement," dated April 18, 2011, which is purportedly the contract provided to Artola

by MRC.[21] This contract, which appears to be a generic form document, is seven pages long and primarily contains type-written descriptions of the terms between the "Company" and the "Contractor." MRC is specifically mentioned only in the first paragraph of page one, and again underneath the signature of an unidentified MRC "distribution manager" on pages five and seven. The contract does not appear to be signed or initialed by Orlando Artola, though his name and the date are handwritten in the blank spaces provided on pages one, five, and seven. His contact information is also handwritten on page five. On page six, there is a handwritten "Contractor Rate," delineating how much the Contractor will get paid per stop: $9.50 for both AM and PM at H.D. Smith, and $9.00 per stop in Dade County, $8.75 for Broward County, for "ABC."[22] No other details regarding requirements or expectations for drivers assigned to H.D. Smith are included in the contract.

The typewritten paragraphs outline the overall terms between the Company and the Contractor. Contractors are told they are independent contractors, who are permitted to hire their own employees, as long as those employees submit to random drug testing and the Contractor complies with Worker's Compensation, Disability, Unemployment and tax laws. Contractors must also submit to random drug testing,

---

[21] Artola agrees he signed at least one contract, but says he was not given time to review it and denies that the contract in the record is the one that he signed. (Pl. dep. 135:18-136:14.) Even though only the April 2011 contract is in the record, the record suggests there were subsequent contracts between Artola and MRC. (R. Artola dep. 39:7-16; Brioso dep. 33:12-16.)

[22] "ABC" is another pharmaceutical delivery customer of MRC. The record is silent as to why this company is listed on the contract; all other evidence suggests Artola only worked at H.D. Smith.

and there is a Drug Free Work Place agreement addendum. Contractors are allowed to work for other companies, with the exception of the Company's customers. Contractors' employees and family members are also prohibited from working for Company customers. Contractors are responsible for all expenses. Contractors must agree to indemnify the Company from third-party claims.  The Company does not agree to provide Contractors with any specific amount of work, and Contractors are allowed to reject work without repercussion. As to accepted deliveries, Contractors must agree to make them in a reasonable amount of time and "in accordance with the terms of the customer." The Company has no "right to exercise control, discretion, or supervision" over drivers or their employees. Contractors cannot act as agents or enter contracts for the Company. Finally, the contract provides an "indefinite" term of employment, and allows either party to terminate the contract at any time, for any reason.

## B.  DISPUTED FACTS

MRC essentially contends its practices were in line with the language and spirit of the contract. Artola disputes this contention in material ways. For example, Artola asserts that he had no ability to reject deliveries to which he was assigned, irrespective of contract language to the contrary.[23] MRC, however, contends drivers could decline stops without repercussion.[24]

The AM route start time is also disputed. Artola says he was required to show up

---

[23] Pl. dep. 54:11-25; 140:22-141:7.
[24] Brioso dep. 17:14-18:4; Bethencourt dep. 33:7-34:7.

at 6:00 a.m., when H.D. Smith's warehouse opened, or else he would lose the route entirely.[25] MRC's Executive Vice President, Robert Bethencourt, testified that drivers could "show up whenever [they] wanted" after 6 a.m.,[26] with the only consequence being possibly losing that shift on that particular day because the product to be delivered may have been taken by another driver.[27] The Logistics Manager for MRC, Richard Brioso, testified that Artola and other drivers arrived around 6 a.m. daily, but he does not say they were required to do so.[28] An affidavit provided by a former MRC driver says he was never reprimanded for showing up at various times—though it also says he showed up every day between 5:45 a.m. and 6:10 a.m., leaving little opportunity for lateness consequences.[29]

There are multiple controversies surrounding the role of Luis Bueno.[30] Even though MRC contends that Artola did not have a supervisor,[31] H.D. Smith's Director of Operations, John Daniel Howard, describes Bueno as MRC's "point person on the [H.D. Smith] dock" and MRC driver coordinator, who reported any of H.D. Smith's concerns to Brioso.[32] Artola describes Bueno as his manager,[33] and it is partially *through* Bueno that Artola asserts MRC exerted significant control. Artola claims Bueno told him to

---

[25] Pl. dep. 126:10-25.
[26] Bethencourt dep. 86:6-12.
[27] Howard dep. 53:13-54:23.
[28] Brioso dep. 10:23-11:7.
[29] Aff. of Yosvani Alonso, ¶14.
[30] Despite the apparently pivotal role Bueno served in the instant controversy, neither party deposed him, nor provided his affidavit.
[31] Brioso dep. 9:3-18.
[32] Howard dep. 24:6-25:2.
[33] Pl. dep. 35:2-4.

misreport delivery times to make sure he did not report any deliveries after 5 p.m., even though they were in fact completed after that time.[34] MRC claims Artola did not conduct deliveries after 5 p.m.,[35] and that MRC did not keep any records of his time.[36] Whether Bueno was a de facto manager for MRC at H.D. Smith, and, if so, whether he had drivers maintain falsified time records, is disputed evidence that is material to driver independence.[37]

Another Bueno-centric dispute involves the purported freedom of drivers to hire and manage their own employees or "helpers," independent of MRC involvement. Artola asserts that Ms. Artola submitted an application to MRC, including a drug test, and, though she was never hired, she became a "registered" helper.[38] Ms. Artola testified that her assignments as a helper were managed by her husband *and* by Luis Bueno, in that Bueno would call on Ms. Artola to assist her husband.[39] Ms. Artola also avers that Bueno called her to help other MRC drivers, that she had to maintain contact with Bueno while she was covering for other drivers, and those drivers had to report to

---

[34] Pl. dep. 46:8-23.

[35] Brioso dep. 13:22-14:13.

[36] *Id.* at 15:8-11; Bethencourt dep. 35:19-21. Manifests filed as exhibits undermine both Artola and MRC contentions regarding deliveries after 5 p.m., in that some reflect delivery times between 5 p.m. and 6 p.m.

[37] This allegation, if found credible, is additionally relevant to overtime liability. *See Bailey v. TitleMax of Georgia, Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) ("Knowledge [of unpaid overtime work] may be imputed to the employer when its supervisors or management 'encourage [ ] artificially low reporting'.") (internal citations omitted).

[38] Pl. dep. 130:6-14; 142:16-19.

[39] R. Artola dep. 54:20-55:25.

Bueno when she completed deliveries on their behalf.[40] MRC denies any knowledge of whether Artola had a helper.[41] Whether Artola truly had the authority to independently employ others, or if, instead, that power was essentially ceded to MRC via Luis Bueno, appears to be a material dispute.[42]

Artola also contends that in late winter 2014, Bueno told him MRC would no longer pay Artola directly, and that he had to create his own corporation in order to be paid.[43] MRC vigorously disputes this allegation, and has provided the affidavit of a former driver who said he was never told by MRC that he had to create his own corporation, and that he and other drivers never incorporated.[44]

The parties also dispute whether drivers could and did meaningfully negotiate rates per stop. MRC says drivers negotiated their rates when they entered into their Contractor Purchased Transportation Agreement. Though MRC offered no witness to the actual alleged negotiation between MRC and Artola, it did provide a Contractor Purchased Agreement with Artola's name on it, listing prices per stop which varied by customer and shift. It is also clear from the record that drivers did have different rates, and that Artola was aware of that.[45] However, Artola denies having negotiated his rates

---

[40] July 20, 2015 Aff. of Rebeca Artola, ¶¶4-10.
[41] Brioso dep. 18:18-21.
[42] *Scantland*, 721 F.3d at 1317 (describing ability of plaintiff-workers to increase profits by hiring help as "illusory" where, despite contract language to the contrary, helpers were actually managed by—and contracted with—the defendant-employer).
[43] Pl. dep. 43:13-17.
[44] Aff. of Yosvani Alonso, ¶ 3.
[45] Pl. dep. 144:10-12.

at the onset,[46] though he admits to lowering his rates at one point.[47]

## III.   <u>DISCUSSION</u>

There are four issues awaiting summary judgment. First, both parties moved for summary judgment on the question of whether Artola was an employee or an independent contractor under the FLSA. The below multi-factorial analysis reveals material disputes and evidentiary gaps which preclude summary judgment. Second, Artola moved for summary judgment on overtime liability. Third, MRC moved for summary judgment as to the months MRC paid Artola's corporation for Artola's services. Both of those motions are also denied. Finally, the Defendants moved for summary judgment as to Defendant Alpha Logistics Services, Inc. That motion is granted.

### A.  EMPLOYEE VERSUS INDEPENDENT CONTRACTOR

Six factors guide the Court's evaluation of the economic reality of the relationship between an alleged employer and its workers.[48] These factors are not exclusive, and their relative weight depends entirely on the facts of the case.[49]

### i.  Control

The nature and degree of an alleged employer's control over work performance matters to the extent that "it shows that an individual exerts such control over a

---

[46] *Id.* 144:4-12.
[47] *Id.* 149:17-151:14.
[48] *Scantland,* 721 F.3d at 1312.
[49] *Id.*

meaningful part of the business that [they] stand as a separate economic entity."[50] While there are undisputed facts relevant to control which point toward employment, others weigh toward independent contractor status. For example, that drivers had to contact MRC if they were running late or had to take the day off, weighs toward employee status. On the other hand, drivers planned their route between stops, which weighs toward their independence.

Relevant evidentiary gaps also remain. For example, the Contractor Purchased Transportation Agreement requires that drivers conform to the terms of MRC customer agreements (e.g., the carrier contract between H.D. Smith and MRC), even though the specifics of those agreements are not outlined in the driver contract itself.[51] The record is silent as whether drivers were informed of the terms of customer agreements that would affect driver's daily work prior to signing the contract.  The record is also silent as to how drivers' geographic area was assigned or negotiated. These unanswered questions preclude a sufficient understanding of the economic reality for MRC drivers.[52]

Further, there are multiple material disputes relevant to the control factor. For example, because the number of stops (deliveries) dictated drivers' daily income as well as their daily schedule, the ability to freely decline stops is integral to the drivers'

---

[50] *Usery,* 527 F.2d at 1312-13.
[51] Contractor Purchased Transportation Agreement, ¶ 5(b).
[52] *See Olson v. Star Lift Inc.,* 709 F. Supp. 2d 1351, 1356 (S.D. Fla. 2010) (noting fact that employer controlled client to which worker was assigned weighed toward employee status).

economic independence, and whether it existed in practice is a material dispute.[53]

Whether drivers had a fixed start time,[54] and whether they risked losing their regular

route(s) as a punishment for showing up late, is also a material dispute because it

impacts drivers' ability to set their own schedules and operate independently of MRC.

Finally, if it is true that Bueno, as MRC's agent, pressured Artola into creating U-Trust,

that would weigh against finding that Artola was operating as a separate economic

entity, and toward a finding that MRC exerted significant control over Artola, if not

other drivers.

Material disputes and factual ambiguity prevent the Court from determining

whether Artola had such a degree of control as to be considered a separate economic

entity or was, instead, "dependent upon finding business in the employment of

others."[55] Therefore, no determination can be made as to the control factor.

## ii. Opportunity for Profit & Loss

A worker's opportunity for profit or loss suggests independent contractor status

where that opportunity is related to the worker's exercise of managerial skills such as

initiative, judgment and foresight.[56] In contrast, opportunities for profit or loss based on

the worker's efficiency or technical proficiency are not particularly meaningful in

---

[53] *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (distinguishing between employee-drivers and contract-drivers in part by their ability to reject deliveries).
[54] *Id.* at 302 (noting that employee-drivers has a set start time, whereas contract-drivers did not); *Star Lift*, 709 F. Supp. 2d at 1356 (noting fact that employer controlled what time worker went to work weighed toward employee status).
[55] *Scantland*, 721 F.3d at 1312 (quoting *Mednicj v. Albert Enters., Inc.*, 508 F.2d 297, 301-02 (5th Cir. 1975)).
[56] *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729-30 (1947); *Scantland*, 721 F.3d at 1317.

distinguishing between employees and independent contractors.[57]

Most courts appear to separate this factor from the worker's employment of others, and instead consider the employment of others as part of the investment analysis. However, where, as here, MRC argues that Artola's use of a helper demonstrates his exercise of managerial skill, these two considerations are more appropriately evaluated together.

While Artola did have some opportunities for profit or loss, the majority appear to have been based on factors that were at least to some extent beyond Artola's control,[58] or on his efficiency—not his managerial skill. This suggests a finding that Artola's opportunity for profit or loss was similar to that of an employee. However the material dispute over whether Artola truly had the authority to employ others, or if, instead, that power was "illusory,"[59] as well as material disputes—and unknowns—regarding rate negotiation,[60] prevent a finding on this factor.

### iii. Investment

Evaluating worker investment—and assumption of risk—as compared to that of the alleged employer helps distinguish between workers "in business for themselves,"

---

[57] *Scantland*, 721 F.3d at 1317.

[58] *See Scantland*, 721 F.3d at 1316-17 (finding ability of workers to increase profits by trading or completing extra jobs not meaningful opportunity where it was limited by factors controlled by employer, such as the number of jobs assigned and the work schedule).

[59] *Id.* at 1317 (describing ability of workers to increase profits by hiring help as "illusory" where, despite contract language to the contrary, helpers were actually managed by employer).

[60] The record is silent as to what MRC was paid per stop at H.D. Smith, and as to whether drivers knew what MRC was paid when drivers allegedly negotiated their own rate per stop. *See id.* at 1313 n.4, 1317 (noting workers inability to negotiate rates and inability to influence employer/worker split as to pay per stop undermined worker opportunity for profit or loss and weighed toward employee status).

and workers who are economically reliant on their employers' business.[61] Not all worker investments suggest economic independence.[62] Large capital expenditures, such as the purchase of a vehicle used primarily for business, are most meaningful.[63] Hence, Artola's maintenance and purchase of a work vehicle, used principally for business, weighs toward independent contractor status.

Artola's considerable business expenditures also weigh against employee status. However, their significance is arguably diminished where at least some portion of his investment is the result of an apparent policy to shift costs to drivers.[64] Relatedly, the filing of 1099s, and the corresponding "self-employed" tax designation, as well as the requirement that drivers provide their own insurance, weighs only slightly toward independent contractor status where, as here, each of those decisions is the result of a determination by MRC, not its drivers.[65]

Many courts consider an evaluation of the "relative investment" of the parties useful in understanding the economic reality.[66] However, each FLSA employee claim is

---

[61] See Usery, 527 F.2d at 1313–14.

[62] Keller v. Miri Microsystems LLC, 781 F.3d 799, 810 (6th Cir. 2015).

[63] See Dole v. Snell, 875 F.2d 802, 810 (10th Cir. 1989).

[64] See Usery, 527 F.2d at 1313 ("The lease requirement-which the record does not show was ever subject to negotiation-that the operators accept responsibility for bad-check and theft losses does not show independence. Rather it shows that [the employer] chose to place this added burden on its [workers].")

[65] See Robicheaux v. Radcliff Material, Inc., 697 F.2d 662, 667 (5th Cir.1983) (finding self-employed designation on tax returns and requiring workers to provide own insurance does not tip the balance in favor of independent contractor status where economic reality indicates employee economically dependent on employer); Star Lift, 709 F. Supp. 2d at 1356 (worker's receipt of 1099 from employer does not weigh in favor of independent contractor status).

[66] E.g., Miri Microsystems, 781 F.3d at 810; Express Sixty-Minutes, 161 F.3d at 303; Sakacsi v. Quicksilver Delivery Sys., Inc., 2007 WL 4218984, at *6 (M.D. Fla. 2007).

highly fact-specific, and it is possible that the "relative investment" of MRC is not especially meaningful where Artola worked out of an MRC customer warehouse as opposed to an MRC facility. Neither party has submitted evidence regarding MRC's relative financial investment. Because the undisputed evidence does not weigh strongly in either direction at this point, and because there is no evidence regarding the relative investment of MRC, the Court cannot make a finding as to the investment factor.

### iv.  Special Skill

A worker with unique skills and the opportunity to exercise initiative is more likely to be able to operate as an independent business entity than an interchangeable worker who completes routine tasks. Hence, utilization of initiative and the employment of special skills indicates independent contractor status, whereas a lack of and initiative and specialization indicates employee status.[67]

Driving is not a special skill.[68] Neither is manual labor (loading and unloading vehicles).[69]  The complete lack of formal training provided to or required by drivers further weighs toward employee status as to this factor.

However, MRC contends that Artola's tax returns reflect a "special skill" because he and his wife kept track of their work-related expenses, compared cell phone plans, and handed over financial information to an accountant. While these are not necessarily

---

[67] *Usery*, 527 F.2d at 1314.

[68] *Express Sixty-Minutes*, 161 F.3d at 305; *Molina v. South Florida Exp. Bankserv, Inc.*, 420 F. Supp. 2d 1276 (M.D. Fla 2006).

[69] *Villarreal v. Samaripa Oilfield Servs., LLC*, No. 4:13-CV-02662, 2014 WL 7405206, at *2 (S.D. Tex. 2014) (finding manual laborers and drivers possessed no particular special skill).

unique skills,[70] together with route planning, which may require some initiative and skill, reasonable jurors could disagree about whether some specialization was involved and how much weight to give this factor in the context of an industry where, generally, special skills may not be not required. In light of the Court's overall denial of summary judgment, a judicial finding on this factor is inappropriate.

### v. Permanency & Duration.

A longer, more permanent working relationship weighs toward employee status because it suggests heightened economic dependence on an employer's business, whereas finite, non-exclusive work relationships allow for the greater economic independence enjoyed by a worker operating a business entity which operates independently from an alleged employer.[71]

The limited evidence the parties provided suggests at least some MRC drivers at H.D. Smith worked for MRC for a number of years, and that the practice of MRC was in line with its indefinite contract language. The extended and indefinite working relationships reflected in the record weigh toward finding employment status.[72]

The purported mutual ability to terminate the contract without notice could support either employee or independent contractor status, depending on the actual

---

[70] See Usery, 527 F.2d at 1314 ("Minor record-keeping such as personal tax records is not determinative of independent status.").
[71] See Miri Microsystems, 781 F.3d at 807-08.
[72] See Donovan v. DialAmerica Marketing Inc., 757 F.2d 1376, 1384-85 (3rd Cir. 1985) (noting fact that workers worked continuously for employer indicates workers were employees); Solis v. Velocity Exp., Inc., 2010 WL 3259917, at *9 (D. Or. 2010) (noting if drivers' contracts were indefinite, and routinely renewed, that fact would favor employee status).

practice of the parties.[73]  On one hand, in light of the indefinite working relationship

established in practice and in the contract, it does little to distinguish independent

contractors from employees, because it could function in a manner akin to "at will"

employment.[74] On the other hand, it could provide workers with the freedom to move

on to more lucrative or otherwise satisfying jobs whenever those opportunities arose, or

to use other opportunities as leverage.

The undisputed fact that drivers could, and did, work for other delivery

companies, while working for MRC, suggests independent contractor status.[75] This fact,

combined with Artola's decision to take on two routes, may distinguish Artola from

plaintiffs who, as a group, say they uniformly had no way to exercise their alleged right

to work for other companies.[76] However, because Artola says his schedule did not allow

him to work for other companies, and the record is not clear as to whether other drivers

who covered both shifts actually did work for other companies, there appears to be a

genuine material dispute about whether Artola and MRC had a "de facto" exclusive

relationship.[77] This dispute precludes a factual finding on this factor.

---

[73] *See Hopkins v. Cornerstone Am.*, 545 F.3d 338, 345-46 (5th Cir. 2008) (contrasting plaintiffs found to be employees and independent contractors, each with "at-will" contract terms, noting preeminence of "economic reality" analysis).

[74] *See Solis v. Cascom, Inc.*, 2011 WL 10501391 at * 6 (S.D. Ohio 2011) (workers who "worked until they quit or were terminated" had relationship "similar to an at-will employment arrangement").

[75] *Express Sixty-Minutes*, 161 F.3d at 305; *South Florida Express*, 420 F.Supp. 2d at 1287.

[76] *Scantland*, 721 F.3d at 1317 (noting *uncontroverted* worker allegation that employer schedule effectively prohibited *all* workers from exercising right to work for other companies weighed toward employee status for control, opportunity for profit, and permanence factors).

[77] *See Miri Microsystems*, 781 F.3d at 808-09 (finding material dispute as to exclusivity of working relationship where employer said worker could work for other companies but worker claimed his

### vi.   Integral Nature of Service.

The final factor of the analysis considers the extent to which the services provided by the worker are an integral aspect of the alleged employer's business. The more integral the service, the more likely the worker is an employee. [78] Delivery drivers are integral to the delivery business. [79] The undisputed facts suggest delivery drivers like Artola provided an integral service to MRC's business. However, other facts also suggest Artola was interchangeable, and that MRC derived significant income from sources other than delivery. More information regarding the "economic reality" of MRC's business would be required for the Court to make a finding on this factor.

### vii.   Employee v. Independent Contractor Conclusion

Viewing each side's facts in the light most favorable to the other, and with all reasonable inferences provided to both parties, neither party has established sufficient undisputed evidence to allow the Court to determine whether Mr. Artola was an employee or independent contractor as a matter of law. Without that preliminary determination, the Court is unable to reach the issue of liability. Summary judgment is thus improper, and denied.

---

schedule left no time to work for other companies).

[78] *Scantland*, 721 F.3d at 1319 (noting where service provided by workers is admittedly the "backbone" of a business, the employer is unlikely to relinquish sufficient control over business for workers to truly act as independent contractors).

[79] *See Quicksilver Delivery Sys.*, 2007 WL 4218984, at *8 (finding delivery driver services integral to courier delivery company); *South Florida Express*, 420 F.Supp. 2d at 1287 (finding parties could not reasonably dispute integral nature of courier service for courier company).

### B. OVERTIME CLAIM

The Plaintiff also moves for a judgment that Artola has established MRC's liability as to some amount of overtime pay as a matter of law. [DE-38.] That finding, however, is contingent upon a finding that Artola is an employee. For all the reasons stated above, the present record does not allow the Court to conclude that Artola is an employee. Even so, viewing the evidence of overtime independently and in the light most favorable to MRC, there are genuine issues of material fact as to whether Artola worked overtime due to inconsistencies within Artola's own testimony, as well as inconsistencies between his testimony and documentary evidence. Given that the Court cannot determine whether Artola was an employee, and even were the Court to determine that he was, there remain genuine issues of material fact as to whether Artola worked overtime, the Plaintiff's motion for summary judgment as to overtime liability must be denied.

### C. U-TRUST "DEFENSE"

Defendant MRC argues that Artola cannot assert any FLSA claim from March through August 2014, because MRC paid Artola's corporation, U-Trust Delivery, for Artola's delivery services during that time. [DE-35.] MRC provided no legal authority in support of its contention that MRC paying Artola's corporation, rather than Artola, deprives Artola of any claim to unpaid overtime during that period as a matter of law. Therefore, viewing the evidence and all reasonable inferences therefrom in the light

most favorable to the non-moving party, the Defendant's motion for summary judgment as to any alleged unpaid overtime while Artola was paid through U-Trust Delivery is denied.

### D. ALPHA LOGISTICS SERVICES, INC.

Artola originally sued both MRC and Alpha Logistics Services, Inc., as joint employers. [DE-1.] MRC asserted that Alpha Logistics Services, Inc., has no employees or revenue and was created by MRC solely because MRC does business as Alpha Logistics Services, and MRC wanted to make sure no other company took the name Alpha Logistics Services, Inc. [DE-36, ¶¶44-45.] Following the completion of discovery, Artola conceded there was no evidence Alpha Logistics Services, Inc. had employed Artola. [DE-42. ¶5.] On the basis of Artola's stipulation, the motion for summary judgment for Defendant Alpha Logistics Services, Inc. is granted.

### IV.   CONCLUSION

For the reasons stated above, the cross motions for summary judgment must be denied in large part, and granted only as to Defendant Alpha Logistics Services, Inc. The case will proceed to trial, consistent with the Scheduling Order entered on November 25, 2014. [DE-16.]

It is hereby ORDERED that:

(1)  Plaintiff's Motion for Partial Summary Judgment is DENIED.

(2)  Defendant MRC Express, Inc.'s Motion for Summary Judgment is DENIED.

(3)  Defendant Alpha Logistics Services, Inc.'s Motion for Summary Judgment is GRANTED, upon stipulation by the parties.

(4)  The parties are reminded of the **October 19, 2015** pretrial conference date, and that by **October 12, 2015,** the parties shall file:

    (a)  A JOINT PRETRIAL STIPULATION pursuant to Local Rule 16.1 (e).  In addition to the requirements of Local Rule 16.1(e)(9), the parties shall prepare their <u>exhibit lists</u> using Form AO 187, which is available through the Court's website, and identify the witness introducing each exhibit.  In addition to the requirements of Local Rule 16.1(e)(10), the <u>witness lists</u> shall contain a one sentence synopsis of the testimony, and in consultation with opposing counsel, indicate the amount of time needed for direct and cross examination of the witness.  The parties shall meet prior to the deadline for filing the pretrial stipulation to confer on the preparation of that stipulation.  The Court will not accept unilateral pretrial stipulations, and will strike, *sua sponte*, any such submission(s); and

    (b)  PROPOSED JOINT JURY INSTRUCTIONS.  The parties shall file (and email a copy to Chambers in WordPerfect format to <u>Seitz@flsd.uscourts.gov</u>) Proposed Joint Jury Instructions and a Proposed Joint Verdict Form in the following form:

        1.  Joint Proposed Jury Instructions:   The jury instructions shall set out the legal elements of the parties' claims and defenses, consistent with and citing to the Eleventh Circuit Pattern Jury Instructions, where applicable.

        2.  Disputed Jury Instructions: Any disputed instruction shall clearly indicate which side is proposing the instruction, the authority for use of the instruction, and the reasons the other side opposes the instruction.

        3.  Verdict Form: To the extent possible, the parties shall submit a joint verdict form.  If the parties cannot agree, the opposing party shall set out the reasons it opposes the proposed verdict form. Given the disputed issues of fact, <u>it is essential that the verdict form provide for explicit factual findings.</u>

(c)  JOINT SUMMARY OF RESPECTIVE MOTIONS IN LIMINE.  The Joint Summary shall contain a cover page providing the style of the case and an index of the motions in limine. The parties shall attach their motions to the Joint Summary cover page as follows: for each evidentiary issue a party may submit a one (1) page motion identifying the evidence sought to be precluded at trial and citing legal authority supporting exclusion; and the opponent may submit a one (l) page response providing a statement of the purpose for which the challenged evidence would be offered and citing legal authority in support of admission of the challenged evidence. No parties' motion in limine or response shall exceed one typed single-spaced page.  The parties shall work together to prepare the Summary, and prior to submitting it to the Court, the parties are encouraged to resolve evidentiary issues through stipulation.

(d) Should the parties settle, they should jointly file written notice of settlement.


DONE AND ORDERED in Miami, Florida, this 25ᵗ day of September 2015.


PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE


cc:     Counsel of Record